1

2

3

4

5

6

# UNITED STATES DISTRICT COURT

7

### EASTERN DISTRICT OF CALIFORNIA

8

9

10

| | |
|---|---|
| FRESNO UNIFIED SCHOOL DISTRICT, | Case No. 1:12-cv-01699-MJS |
| Plaintiff/ Counter Defendant, | |
| v. | ORDER DENYING COUNTER CLAIMANTS' MOTION TO AMEND COUNTER CLAIM |
| K.U., a Student, by and through her educational rights holder and mother, A.D.U., and A.D.U., individually, | |
| Defendants/Counter Claimants. | (Docs. 85 and 86) |

11

12

13

14

15

16

17

18

Defendants/Counter Claimants K.U., by and through her mother and educational rights

19

holder, A.D.U., and A.D.U.,[1] individually, by their attorney, Roger A. Greenbaum, move to amend

20

and supplement their counter claims.  The proposed amended and supplemental counter claims (1)

21

add a claim that the ALJ erred in failing to order Plaintiff Fresno Unified School District to provide

22

Plaintiff with compensatory education; (2) add a claim demanding that Plaintiff amend certain

23

unspecified inaccurate or misleading information in K.U.'s education records in compliance with 34

24

C.F.R. §§ 300.618-300.621; (3) add a claim seeking a writ of mandate pursuant to California Code

25

of Civil Procedure § 1085; (4) demand attorneys' fees authorized for the prevailing party on a

26

27

28

---

[1] Counterclaimants will be collectively referred to as "A.D.U."

1

petition for a writ of mandate, and (5) demand a monetary sum sufficient to provide compensatory education to K.U.  Having reviewed the record and applicable law, the Court denies the motion.

## I.   Factual and Procedural Background

According to the written decision in Case No. 2012010705,[2] dated August 3, 2012, K.U. (born December 20, 1991) is eligible for special education services as a student with an intellectual disability.  She resides within the boundaries of Plaintiff Fresno Unified School District.  Her mother, A.D.U., is her conservator and holds her educational rights.

Beginning with the 2006-07 school year, K.U. attended classes full time at Duncan Polytechnical High School.    Her most recent academic assessment was performed in 2002.  She graduated in June 2010, receiving a certificate of attendance in lieu of diploma.  Nonetheless, K.U. continued to attend Duncan full-time in the 2010-11 school year, although her participation was frequently interrupted by a seizures that resulted in headaches, memory loss, and multiple absences.

### A.   Proceedings Regarding K.U.'s Educational Placement

In April 2011, the District sent A.D.U. notice that K.U.'s annual individualized education program ("IEP")[3] team meeting was scheduled for May 23, 2012, and that K.U. would not attend Duncan the following year.  A.D.U. objected, demanding that any placement decision be made at the IEP meeting.  The District sought to move Plaintiff, who was then twenty years old, to an adult transition program intended to serve students from 18 to 22 years, who had passed high school age.  On May 17, 2011, the District informed A.D.U. that no further assessment was needed to determine K.U.'s eligibility for continued special education.  As the end of the school year approached, the

---

[2] The parties have numerous resolved and pending petitions before the Office of Administrative Hearings (OAH).  This case concerns only the District's appeal of Case No. 2012010705 and A.D.U.'s counter claim.

[3] An IEP is a written statement setting forth a disabled child's present levels of achievement and performance, measurable annual academic and functional goals, how progress will be measured, statement of special education and services to be provided, an explanation of the extent to which the child will not participate in regular classes with nondisabled children in regular class, a statement of individual appropriate accommodations and alternative assessments, and the projected date for the beginning of services.  20 U.S.C. § 1414(d)(i)(I-VII).  Beginning no later than the first IEP to be effective when the child is 16, the IEP must also include appropriate measurable postsecondary goals relating to training, education, employment, and where, appropriate, independent living skills.  20 U.S.C. § 1414(d)(A)(i)(VIII).

District assigned Susan Kalpakoff, who supervised the adult transition program at Fresno City College, as K.U.'s case manager.

At the District's request, A.D.U. visited two of three available adult transition programs before the IEP meeting.  A.D.U. considered neither to be appropriate for K.U.  A.D.U. wanted K.U. to remain at Duncan, where she had made significant academic progress.  A.D.U. thought K.U.'s program should emphasize academic skills, rather than the practical skills such as mobility, time management, and vocational skills that are emphasized in the transitional program.  She considered K.U. to be mildly disabled, typical in her social interactions, and better behaved than many non-disabled students.

The May 23, 2011 IEP meeting included A.D.U.; K.U.'s advocate Sandra Hammond; Varduhi Rosie Kardotyan, a Central Valley Regional Center[4] counselor; Sharon Richards, a District case manager; District administrators Cheryle Anderson and Jonie Defillipo; Anna Demaree, K.U.'s R.O.P. teacher at Duncan; an unnamed school psychologist; and an unnamed school counselor.  The District's agenda included two items: K.U.'s placement for the 2011-12 school year and the "fading"[5] of the one-on-one aide who had assisted K.U. at Duncan.  Plaintiff's levels of performance included the results of a 2008 academic ability test (WIAT-II) and undated reports that Plaintiff was working on upper-first-grade math skills and first-to-second grade reading skills.  Teachers reported that Plaintiff completed art projects with support; did most of what she was asked in Forestry; and identified flowers and performed modified classwork in floral design.  Further proposed levels of performance indicated that K.U. had good communication skills, and good fine and gross motor skills.  K.U. was friendly, polite, willing to do her work, and able to care for her personal needs

---

[4]   The State of California finances the Central Valley Regional Center to advocate for, and provide services to, persons with developmental disabilities.

[5]   The Court assumes that "fading" was intended to mean that the District would gradually discontinue K.U.'s aide as she transferred into the transition program.

3

while at school and to advocate on her own behalf.  Her many absences, headaches, and early departures had affected K.U.'s relationships with her peers.

After the District offered three adult transition programs for 2011-12, the IEP meeting was adjourned to allow A.D.U. to view those she had not yet visited.  A.D.U. wanted K.U. to focus on academics and socialization, and sought to have her remain at Duncan.

A.D.U. rejected the Instructional Media Center program (IMC), which served students with moderate-to-severe intellectual disabilities since she believed K.U. was mildly-to-moderately disabled.  A.D.U. believed that IMC offered nothing more than simple, functional academics.

A.D.U. also rejected the Cesar Chavez program, which served mild-to-moderately disabled students, focusing on intensive language arts and math, and providing vocational training.  The vocational training program was not designed for intellectually disabled students.  A.D.U. was disturbed by the students' behavioral and emotional issues, particularly "cussing in the classrooms." Doc. 3-1 at 6.  "She also spoke to the administrator at Cesar Chavez, who recommended against placing [K.U.] in the program." *Id.*

The IEP meeting reconvened on June 10, 2011.  Attendees were A.D.U.; Felicia Puente, K.U.'s Regional Center case manager; Ms. Defillipo; Ms. Anderson; an unidentified school psychologist; and an unidentified counselor.  Since the May meeting, the draft I.E.P. had been edited to list K.U.'s school of attendance as the District's adult transition programs rather than Duncan.  Personal levels of performance had been edited to reflect that Plaintiff had made steady progress on her 2010-11 annual goals.  Although A.D.U. and Ms. Hammond[6] insisted that the I.E.P. should specify K.U.'s goals, the District participants refused to do so, instead stating that the District had not been permitted to assess K.U., which was a prerequisite to determining goals.  (The ALJ found that the District had never asked to assess Plaintiff.)

---

[6]   Although the OAH decision does not include Ms. Hammond on its list of attendees of the June 10, 2011 meeting, her opinion is reflected in later fact finding.

A.D.U. and the District participants also disagreed on possible placements. The District considered only the three adult transition programs, but A.D.U. wanted K.U. to remain at Duncan for a sixth year. A.D.U. argued that at Duncan, K.U. had made good academic progress, had friends and socialized when she was not suffering from seizures and related symptoms, and was mainstreamed. In the adult transition programs, protested A.D.U., K.U. would be placed only with disabled students, would no longer participate in a general education curriculum, and would not progress in academics. The District offered placement in the IMC program, with goals to be determined after thirty days of participation. A.D.U. refused to consent.

On June 20, 2011, the District sent A.D.U. prior written notice of its intent to discontinue Plaintiff's one-on-one aide since an aide would not be needed in an adult transition program. The notice emphasized the K.U. had graduated from Duncan in June 2010 with 230 high school credits and that, in 2011, at 19 ½ years of age, she was appropriately placed in her least restrictive environment: an adult transition program with age-appropriate peers. On August 12, 2011, Duncan's principal telephoned A.D.U. to advise her that K.U. had been "disenrolled" from Duncan. A.D.U. protested that K.U. had been reassigned without a signed IEP, but the District considered placement at IMC to be an offer of a free and appropriate education.

On September 19, 2011, A.D.U. observed the adult transition program at Fresno City College ("FCC-ATP"). The FCC-ATP program was a collaboration between the District and Fresno City College that "offer[ed] a menu of classes consisting of (1) intervention classes in reading and writing in the morning, taught by a District teacher, (2) afternoon classes run by the Fresno County Office of Education for students with IQs lower than 50, (3) college courses at Fresno Community College, and (4) one-on-one tutoring with a District teacher or paraprofessional when the student was not in another class or program." A.D.U. was "troubled that there were only male, and only disabled, students in the classroom." Doc. 3-1 at 8.

On September 19, 2011, Ms. Kalpakoff agreed to schedule an IEP meeting intended to secure K.U.'s placement in an adult transition program.  She noted that placement in the Fresno City College program was no longer an option since A.D.U. had not registered K.U. for college coursework by the deadline for the fall semester.

A.D.U. retained an attorney, Dria Fearn, who, on October 4, 2011, demanded K.U.'s re-enrollment at Duncan and development of goals prior to any transition planning.  Although the District scheduled an IEP meeting for October 25, 2011, it refused to re-enroll K.U. at Duncan and offered placement in FCC-ATP or IMC.

The October 25, 2011 IEP meeting included A.D.U.; Ms. Fearn; Ms. Hammond; Ms. Puente; Ms. Kalpakoff; Dawn Joest, an advocate from the Area VII Board of the State Council on Disabilities; Sang-Jin Nam and Emily Fulmer, the District's attorneys; and a District staff member who served as scribe.  The meeting considered all three adult transition programs.  A.D.U. reiterated her demand that K.U. be re-enrolled at Duncan.  The District team presented a plan for a comprehensive triennial assessment of K.U.'s academic achievement, social and emotional development, adaptive behavior, post-secondary transition, and assistive technology.[7]  The assessment was to take place within six weeks and be followed by an IEP meeting on December 12, 2011 to review the assessment results and develop K.U's goals and objectives.  A.D.U. requested that a neutral evaluator be retained to conduct the assessment.  The District refused.  A.D.U. did not sign the assessment plan.

The District team suggested placing K.U. in the intervention classes and one-on-one tutoring in the mornings, with three class periods at Duncan in the afternoon, until the December 12, 2011 IEP meeting.  A.D.U. wanted the dual placement to continue through the end of the 2011-

---

[7] A school district must reevaluate a child with a disability at least once every three years unless the school district and the parent agree that reevaluation is unnecessary.  20 U.S.C. § 1414(a)(2)(B)(ii).

12 school year.  She consented to the IEP except for the December end date of the Duncan placement.

K.U. began attending afternoon classes at Duncan on October 26, 2011.  From that date until the December 2011 IEP meeting, A.D.U. and the District conducted ongoing written disputes regarding the assignment of K.U.'s aide, the location at which K.U. ate lunch, K.U.'s inability to participate in extracurricular activities at Duncan, and the District's request to assess K.U.  The disputes were not resolved except that K.U. was permitted to participate in extracurricular activities at Duncan.

Attendees at the December 12, 2011 IEP meeting were A.D.U., Ms. Hammond, Ms. Puente, Ms. Joest, Ms. Kalpakoff, Ms. Demaree, FCC case manager Kimberly Olsen, and meeting scribe Nicole Evangelista.  The District had prepared an agenda that included the concerns that A.D.U. had communicated to the District.  (The ALJ accepted as evidence an audio recording of this meeting.)

Ms. Olsen reported that K.U. understood materials at her reading level, although Ms. Olsen could not specify at what level K.U. was reading.  She added that K.U. was not working on her math goals of multiplication of multi-digit numbers, but was working on "touch money" math, demonstrating difficulty adding and subtracting money.  Ms. Olsen had work samples from Howard Landis, another of K.U.'s teachers, but did not know when they had been completed.  Ms. Demaree reported that when at Duncan, K.U. was happy in class and completed all of her modified work, but had limited interaction with her fellow students, who were new to her.

A.D.U. again refused to sign the assessment plan unless the District provided a neutral evaluator.  Ms. Kalpakoff advised A.D.U. that K.U. could not continue to attend FCC-ATP half-time.  Registration for the FCC-ATP program ended January 6, 2012, and would be required for any attendance there.  If A.D.U. failed to timely register K.U. for FCC-ATP, the only available

programs would be IMC or Cesar Chavez.  A.D.U. protested that the District ran the morning

program and that K.U. did not need to register to attend only the District program.  Ms. Kalpakoff

responded that the FCC-ATP program was a full-day program and that K.U. needed to be placed in

an adult program.  A.D.U. insisted on the dual placement:  Ms. Kalpakoff was adamant that K.U.

would not be permitted to continue at both FCC-ATP and Duncan.  Ms. Kalpakoff also refused to

consider Ms. Hammond's request for a comparison of services and mainstreaming opportunities at

Duncan and FCC-ATP.

The District did not permit K.U. to attend Duncan after December 23, 2011.  A.D.U. filed a

due process hearing request on January 24, 2012.  On February 1, 2012, the OAH issued a stay-put

order requiring the District to continue K.U.'s dual placement at FCC-ATP and Duncan.

In her hearing request, A.D.U. first alleged that K.U. was procedurally denied a free and

appropriate public education because the District had predetermined its offer of a full-time

placement at FCC-ATP without considering placement at Duncan or dual placement at FCC and

Duncan.  A.D.U also alleged that K.U. was denied a free and appropriate public education because

the District denied A.D.U.'s right to actively participate in the IEP process by failing to provide

A.D.U. with necessary information and by refusing to consider A.D.U.'s input regarding K.U.'s

placement, academic and social progress, and goals and objectives.

The District countered that K.U. was barred from challenging the offer of placement in the

FCC-ATP program since A.D.U.'s refusal to consent to the assessment plan left the District without

necessary information.  It contended that A.D.U., not the District, had presented a pre-determined

placement.  Finally, it maintained that A.D.U. had actively participated in the IEP process.

Following the OAH hearing, ALJ Hohensee first noted that, as the petitioning party, K.U.

bore the burden of persuasion on all issues.  The ALJ concluded that the District had predetermined

K.U.'s placement prior to the IEP meeting, a procedural violation that significantly impeded

A.D.U.'s opportunity to participate in the IEP process.  She emphasized that the District had erred in considering K.U.'s placement before it had conducted K.U.'s required triennial assessment and determined her goals and objectives.  The District impermissibly refused to consider A.D.U.'s input regarding goals and objectives, and K.U.'s academic and social progress as well as her opinion about placement.  She rejected the District's argument that A.D.U.'s refusal to consent to the triennial assessment overcame any other procedural violation, emphasizing that the District was required to conduct the assessment even if A.D.U. refused to consent.  Finally, the ALJ faulted the District for failure to provide A.D.U. with information necessary for her to meaningfully participate in the IEP meetings.  The ALJ did not substantively analyze the propriety of K.U.'s stay-put placement at Duncan and FCC, but concluded that the procedural violations acted to deny K.U. a free and appropriate education as a matter of law.

In crafting a remedy, the ALJ emphasized that because the District had failed to assess K.U.'s academic levels and academic performance as required by law, K.U. was at risk of being placed in an inappropriate program for the 2012-13 school year.  She ordered the District to secure within sixty days an independent educational evaluation at the District's expense to determine K.U.'s abilities and educational needs.  In light of the District's misconduct, she also ordered the District to ensure that the independent assessor attended the IEP meeting to fully explain the results of the assessment.  She directed the District also to ensure that all of K.U.'s teachers attended the IEP meeting to provide meaningful and accurate information regarding K.U. academic achievement and functional performance.

The ALJ acknowledged that compensatory education was an available equitable remedy when a student was denied a free and appropriate public education but explained that ordering compensatory education was problematic in this case:

///

9

> An award to compensate for past violations must rely on an individualized assessment, just as an IEP focuses on the individual student's needs. (*Reid ex rel. Reid v. District of Columbia* (D.D.C. Cir. 2005) 401 F.3d 516, 524.)  The award must be "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." (*Ibid.*)

Doc. 3-1 at 26, ¶ 37.

In the absence of a recent educational assessment, the ALJ could not determine whether compensatory education was an appropriate remedy.

On August 10, 1012, the District sent A.D.U. notice that it had selected Paul C. Lebby, Ph.D., to perform an independent educational assessment in accordance with the ALJ's order; a copy of Dr. Lebby's *vita*; the proposed dates, times and locations for Dr. Lebby's classroom observation and assessment; and proposed dates, times, and locations for an IEP meeting to discuss the results of Dr. Lebby's assessment.  Since the ALJ's order mandated that the independent assessment address the areas outlined in the October 25, 2011 assessment plan and consent for assessment, the notice also included a copy of it.

On August 20, 2012, A.D.U. advised the District that K.U. would not be available for assessment on any of the proposed dates; presented alternative dates falling on or just before the end of the sixty-day assessment period; and demanded a location other than that required by District policy.  A.D.U. accused the District of violating the ALJ's order by enclosing with the notice a copy of the October 25, 2011 assessment plan and consent for assessment.

The District explained that it had enclosed the October 25, 2011 assessment plan because the ALJ had ordered the District to follow that plan.  It enclosed the IEE Criteria Sheet to document that Dr. Lebby was an authorized independent evaluator.  Explaining that the extensive time required to conduct an educational evaluation meant that observation and assessment needed to begin immediately, the District provided alternative dates for Dr. Lebby's observation and

assessment.  Finally, the District advised A.D.U. that it had forwarded her requested dates for the IEP meeting to K.U.'s case administrator to coordinate with all the necessary attendees.

On August 24, 2012, A.D.U. demanded an independent evaluator other than Dr. Lebby.  On August 28, 2012, the District denied her request, emphasizing the time constraints for conducting the assessment and requesting consent to proceed.  The District pointed out that the ALJ's order directed the District to select and retain an independent administrator.  A.D.U. did not respond.

On August 28, 2012, the District received from the California Department of Education a Notice of Corrective Action, dated August 21, 2012, requiring the District to provide proof of its compliance with the ALJ's order by November 1, 2012.

In the 2012-13 school year, K.U. attended only the ROP program at Duncan.  Neither A.D.U. nor K.U. participated in any portion of the FCC-ATP program.

On October 3, 2012, A.D.U. filed a new special education due process complaint alleging that the District had denied K.U. a free appropriate public education (Case No. 2012100242).  Doc. 93-2.  The complaint set forth 27 bases for her claim.  Requested relief included: (1) declaratory relief that K.U. had been denied a free appropriate public education for the school years 2010-11 through 2012-13; (2) compensatory education through individual tutoring in written expression, reading, mathematics, and transition services; (3) permission for K.U. to socialize with her nondisabled peers, including during lunch and extracurricular activities at Duncan; (4) reimbursement of transportation costs; and (5) for the 2012-13 school year, (a) placement in a community college program with classroom access to disabled and nondisabled peer; (b) one-to-one tutoring; (c) an adequate transition program including vocational training; and (d) mobility training.

On October 5, 3012, the District also requested a new due process hearing, alleging that K.U. was no longer deriving benefit from the Duncan program she had been attending since 2006

and from which she graduated in June 2010 (Case No. 2012100291).  Since K.U.'s last assessment was in 2002, and since A.D.U. had withheld consent for the required triennial assessments, the District sought a Declaration that it could assess K.U. without A.D.U.'s consent.  It requested a declaration permitting it to discontinue providing instruction to K.U. at Duncan and finding its placement offers in the October 2011 and September 2012 IEPs to constitute offers of a free appropriate public education.  Finally, it sought sanctions against A.D.U. for her failure to make K.U. reasonably available for assessment in compliance with the ALJ's order.

On October 12, 2012, the end of the sixty-day period in which it had been ordered to re-assess K.U., the District filed its complaint in this Court, alleging that A.D.U. had knowingly and willfully failed to comply with her obligations under the ALJ's order and requesting an order that it made reasonable efforts to comply with the ALJ's order and that A.D.U. had failed to make K.U. reasonably available for assessment by an independent assessor.  The District further requested an order that A.D.U.'s bad faith and willful disobedience of the ALJ's order barred her from asserting claims against the District for failure to provide K.U. with a free and appropriate public education.

On October 30, 2012, ALJ Darrell Lepkowsky consolidated Case Nos. 2012100242 and 2012100291.

A.D.U. answered the district court complaint on November 1, 2012, counterclaiming that the ALJ had erred in directing the District to select an independent assessor and requesting a trial *de novo*.

On January 29 and February 6, 2013, the parties attempted to negotiate a settlement.  Thereafter, A.D.U.'s attorney moved to withdraw, alleging irreconcilable differences and A.D.U.'s refusal to cooperate with him or follow his advice.  Following proceedings that are not relevant to this motion, new counsel was substituted for both A.D.U. and K.U.  On August 12, 2013, A.D.U. and K.U. moved to amend and supplement their counterclaim.

Case Nos. 2012100242 and 2012100291 were scheduled for hearing in the OAH in June 2013.  The record does not disclose whether the hearing occurred or the outcome, if any.

**B.    <u>Amendment of K.U.'s Educational Records</u>**

In the proposed amendment, A.D.U. alleges that, beginning in the 2011-12 school year, the District recorded in K.U.'s educational records certain unspecified inaccurate and misleading information regarding K.U.'s attendance history, enrollment history, and teacher identification.  On June 8, 2012, A.D.U. filed a written request for correction with an unidentified designee of the District superintendent.  A.D.U.'s subsequent inspection of the District's attendance records revealed additional inaccurate and misleading information.  Neither the superintendent nor a designee met or offered to meet with A.D.U. to review A.D.U.'s allegations despite the District's legal obligation to conduct such a review.

On July 24, 2012, an unidentified District representative rejected A.D.U.'s request in writing without setting forth the basis for appeal.  On July 27, 2012, A.D.U. wrote back, alleging that the response was insufficient and unlawful, and renewing her request for corrective action.  Neither A.D.U. nor the District took any further action.

According to A.D.U., in the 2012-13 school year, the District again recorded inaccurate and misleading information regarding K.U.'s attendance history, enrollment history, and teacher identification.  On May 21, 2013, A.D.U. filed a written request for correction with an unidentified designee of the District superintendent.  On June 7, 2013, a District representative responded, treating A.D.U.'s correspondence as a request for copies of K.U.'s educational records.  Neither the superintendent nor a designee met or offered to meet with A.D.U. to review A.D.U.'s allegations despite the District's legal obligation to conduct such a review.  The District did not advise A.D.U. of her right to a hearing regarding correction of K.U.'s educational records.  On June 29, 2013, A.D.U. wrote back, renewing her request for corrective action.  The District took no further action.

## II.    **The OAH Decision**

Put simply, the ALJ found that, in attempting to determine K.U.'s appropriate placement without fully having determined the goals and objectives of an appropriate education for her, the District had put the cart before the horse.  Meaningful goals and objectives could not be determined in the absence of the statutorily required educational assessment.  Nor could the ALJ order compensatory education in the absence of an educational assessment, and goals and objectives based on it, which would identify K.U.'s appropriate educational placement.

The ALJ rejected the District's contention that it could not conduct an educational assessment in the face of A.D.U.'s refusal to provide consent.  To ensure that K.U., who was rapidly reaching the age at which her eligibility for a free and appropriate education would end, would receive an appropriate education without further delays, the ALJ ordered the District to conduct an independent educational assessment within sixty days.  The District sought to comply, retaining an independent assessor from the list of eligible professionals.  Demanding an "independent" evaluator of her choice, A.D.U. refused to cooperate, ultimately withholding consent to any independent educational assessment.  The District appealed the OAH order to this Court; A.D.U. counterclaimed.

Both the claim and original counterclaim in this matter concerned the requirement of an independent educational assessment of K.U.  The District's complaint alleged that A.D.U. knowingly and willfully failed to comply with her obligation to cooperate with the ALJ's for assessment by an independent assessor and requested an order that A.D.U.'s bad faith and willful disobedience of the ALJ's order barred her from asserting claims against the District for failure to provide K.U. with a free and appropriate public education.  A.D.U counterclaimed that the ALJ had erred in directing the District to select an independent assessor.

///

14

### III.   Limited Standard of Review

Under the IDEA, a district court must "receive the records of the administrative proceedings," "hear additional evidence at the request of a party," and "bas[e] its decisions on the preponderance of the evidence."  20 U.S.C. § 1415(i)(2)(C).  Review of an administrative record is generally limited to the record before the administrative body.  *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995).  If substantial evidence on the whole record supports the administrative determination, the district court must affirm.  *Id.*  The court must give "due weight" to the administrative decision, and may not "substitute [its] own notions of sound educational policy for those of the school authorities which they review."  *Board of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206 (1982), *superseded by statute on other grounds*, *N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202 (9th Cir. 2008).

### IV.   Amended and Supplemental Pleadings

"Rule 15 addresses both amended pleadings (pleadings that set forth new or additional allegations, facts or claims) and supplemental pleadings (pleadings that set forth transactions or occurrences that have happened since the date of the initial pleading), which relate back to the initial pleading."  William W. Schwarzer, et al., *California Practice Guide—Federal Civil Procedure Before Trial* § 8.27 (The Rutter Group 2013).  An amended complaint under Rule 15(a) permits the party to add claims or to allege facts that arose before the original complaint was filed.  *Eid v. Alaska Airlines, Inc.*, 621 F.3d 858, 874 (9th Cir. 2010), *cert. denied*, 131 S.Ct. 2874 (2011).  Rule 15(d) permits a part to serve a supplemental pleading "setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented."

Under F.R.Civ.P. 15(a)(2), after the responsive pleading has been filed, a party may only amend its pleading with leave of court.  As both parties acknowledge, the Court should apply this

policy "with extreme liberality." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001), *quoting Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990). "If the underlying facts or circumstances relied upon by a party may be a proper subject of relief, it ought to be afforded an opportunity to test its claims on the merits.  In the absence of apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendment previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.--the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962). The Court must be guided by the purpose of Rule 15, which is facilitating decisions on their merits. *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981).

"[A] district court may deny leave to amend where there is any apparent or declared reason for doing so, including undue delay, undue prejudice to the opposing party or futility of the amendment." *Lockman Foundation v. Evangelical Alliance Mission*, 930 F.2d 764, 772 (9th Cir. 1991), *quoting Foman*, 371 U.S. at 182 (*internal quotation marks omitted*).  The decision to grant or deny leave to amend is within the trial court's discretion. *Swanson v. U.S. Forest Service*, 87 F.3d 339, 343 (9th Cir. 1996); *United States v. County of San Diego*, 53 F.3d 965, 969 n. 6 (9th Cir.), *cert. denied*, 516 U.S. 867 (1995).  The court should "examine each case on its facts" and determine the propriety of granting leave to amend on that basis. *SAES Getters S.p.A. v. Aeronex, Inc.*, 219 F.Supp.2d 1081, 1086 (S.D.Cal. 2002), *quoting* 6 Charles Alan Wright, et al., *Federal Practice and Procedure Civil 2d* § 1430 (2d ed. 1990).

The factors are not to be given equal weight. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).  Prejudice to the opposing party must be given the greatest weight. *Id.*  The factors should not be understood rigidly or evaluated mechanically; the court should 'examine each case on its facts" and determine the propriety of granting leave to amend on that

basis. *SAES Getters*, 219 F.Supp.2d at 1086, *quoting* 6 Charles Alan Wright, et al., *Federal Practice and Procedure Civil 2d* § 1430 (2d ed. 1990). Absent prejudice, or a strong showing of the other of the remaining *Foman* factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." *SAES Getters*, 219 F.Supp.2d at 1086.

Similarly, supplemental pleadings can be filed only with leave of court and on just terms. F.R.Civ.P. 15(d). The standards for granting or denying a motion to supplement pleadings under Rule 15(d) are the same as those applied under Rule 15(a). *Glatt v. Chicago Park Dist.*, 87 F.3d 190, 193 (7th Cir. 1996). The resolution of motions to file supplemental pleadings is also a matter of the trial court's discretion. *Keith v. Volpe*, 858 F.2d 467, 473 (9th Cir. 1988), *cert. denied sub nom City of Hawthorne v. Wright*, 493 U.S. 813 (1989).

When a party erroneously denominates a supplemental pleading as an amended pleading, a court simply should evaluate allegations involving facts that occurred after the complaint was filed as a supplemental pleading. *United States ex rel. Wulff v. CMA, Inc.*, 890 F.2d 1070, 1073 (9th Cir. 1989). A.D.U. does not identify which portions of her amended and supplemental complaint are amendments and which are supplements. A.D.U.'s failure to red-line or otherwise identify the modifications to her original complaint further complicate the Court's task. As a result, this order must analyze and identify each modification and address it accordingly.

A. **Untimeliness and Prejudice**

"[K.U.] is a young adult at risk of being placed for the 2012-2013 school year in a transition program that is available, rather than appropriate." Doc. 3-1 at 26. So saying, the ALJ directed the District to act within sixty days to expedite identification of K.U.'s present level of performance, to develop goals and objectives, and to determine her appropriate educational placement. Although the 2013-2014 school year is already under way, K.U. has still not received the educational assessment that the ALJ ordered in August 2012.

The standard of review, as set forth above, contemplates this Court's expeditious resolution of the parties' appeal of the administrative decision.  Since a disabled student's development cannot be put on hold for long periods of wrangling between his or her parents and the school district, an IDEA appeal presents the additional policy concern of resolving the dispute without undue delay lest the disabled student's best interests be compromised by the passage of too much time.

In evaluating any motion for leave to amend, a court may consider the moving party's undue delay in pursuing the amendment.  *Bowles v. Reade*, 198 F.3d 752, 757-58 (9th Cir. 1999).  "A party unduly delays seeking amendment by failing to seek amendment reasonably promptly after it 'knew or should have known' that amendment was called for."  *Johnson v. Hewlett-Packard Co.*, 809 F.Supp.2d 1114, 1120 (N.D.Cal. 2011), *aff'd*, 2013 WL 4757161 (9th Cir. 2013), *quoting AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 953 (9th Cir. 2006).  Here, A.D.U. knew or should have known immediately upon reviewing the administrative decision that the ALJ did not order compensatory education.  She was also already aware that the District had not responded favorably to her 2012 request for amendment of K.U.'s educational records.

Delay alone is generally insufficient justification for denying a motion to amend unless the court also specifically finds prejudice to the opposing party, bad faith of the moving party, or futility of amendment.  *Bowles*, 198 F.3d at 758.  Certain factors may justify permitting late amendment of pleadings: restatement of a claim already in issue; new instances of previously alleged statutory violations; timing early in the discovery period or long before trial; the party's loss of its claim if it were not added to the pending suit; delay but no prejudice to the opposing party; or a claim that may be tried on its merits with no additional facts.  *Chrysler Corp. v. Fedders Corp.*, 540 F.Supp. 706, 715-16 (S.D.N.Y. 1982).  The proposed amended and supplemental counterclaim does not fall within these exceptions.

///

"While delay alone does not justify denial of leave to amend, 'late amendments to assert new theories are not reviewed favorably when the facts and theory have been known to the party seeking amendment since the inception of the cause of action.'" *Stearns v. Select Comfort Retail Corp.*, 763 F.Supp.2d 1128, 1159 (N.D.Cal. 2010) (*internal citations omitted*).  With the exception of the second alleged instance of the District's failure to amend K.U.'s educational records, all of the facts and claims asserted in the proposed amended and supplemental complaint were known or should have been known when A.D.U. filed the original counterclaim.

A.D.U. offers no rationale for the timing of her nearly wholesale amendment of her counter claim.  Whether the moving party knew or should have known facts and theories raised in the proposed amendment at the time it filed its original pleadings is a relevant consideration in assessing timeliness. *Jackson v. Bank of Hawaii*, 902 F.2d 1385, 1388 (9th Cir. 1990).  A moving party's inability to acceptably explain its delay may indicate that the delay was undue. *Swanson v. U. S. Forest Service*, 87 F.3d 339, 345 (9th Cir. 1996); *Jackson*, 902 F.2d at 1388; *E.E.O.C. v. Boeing Co.*, 843 F.2d 1213, 1222 (9th Cir.), *cert. denied,* 488 U.S. 889 (1988).

Undue delay is delay that prejudices the nonmoving party or imposes unwarranted burdens upon the court. *Mayreaux v. Louisiana Health Service and Indem. Co.*, 376 F.3d 420, 427 (5th Cir. 2004).  Prejudice results when an amendment would unnecessarily increase costs or would diminish the opposing party's ability to respond to the amended pleading. *Morongo Band*, 893 F.2d at 1079. For example, when a motion to amend seeks to change a party's claims in close proximity to trial, permitting the amendment may delay the progress of the case and prejudice the opponent's ability to prosecute its case. *Hill v. Opus Corp.*, 841 F.Supp.2d 1070, 1103-04 (C.D.Cal. 2011).  *See also Lockheed Martin Corp.v. Network Solutions, Inc.*, 194 F.3d 980, 986 (9th Cir. 1999) ("A need to reopen discovery and thereby delay the proceedings supports a district court's finding of prejudice from a delayed motion to amend."); *Elite Entertainment, Inc. v. Khela Brothers Entertainment*, 227

1  F.R.D. 444, 448 (E.D.Va. 2005) (finding the defendants' motion to file amended counterclaims that

2  would expand scope and theory of liability just before the expiration of the previously scheduled

3  discovery period to be untimely and prejudicial).

4        Discovery or other litigation costs become prejudicial when the additional costs could easily

5  have been avoided had the proposed amendments been included within the original pleading.

6  *Amerisource-Bergen*, 465 F.3d at 953.  In *Amerisource-Bergen*, the plaintiff filed a breach of

7  contract action alleging that the defendant had provided various counterfeit drugs; the defendant

8  counterclaimed for payment for a particular drug, Procit, that the plaintiff conceded was genuine.

9  *Id.* at 949.  At the end of the discovery period, the defendant moved for summary judgment on its

10  counterclaim.  The plaintiff then sought to amend its complaint to allege that the Procit that it

11  received from the defendant was tainted, providing no explanation for its change of position or its

12  failure to plead the claim in its original complaint.  *Id.* at 953, n. 9.  The court found that the

13  additional discovery would be more expensive in light of the short discovery time remaining and

14  the additional time demands on opposing counsel.  The additional cost was prejudicial since it

15  could have been avoided if the plaintiff had alleged that the product was tainted in the original

16  complaint.  *Id.* at 953.

17        The District suggests that A.D.U.'s sole purpose in the near-complete revision of her counter

18  claims at this late date is to delay resolution of an issue on which she knows she is unlikely to

19  prevail.  Based on A.D.U.'s repeated uncooperative and internally inconsistent tactics[8] throughout

20  the process of determining an appropriate placement for K.U., this Court agrees.  A magistrate

---

[8]   In particular, the Court notes that in Case No. 2012100242, now pending before the OAH, A.D.U. seeks, among other things, compensatory education consisting of individual tutoring in written expression, reading, and mathematics; transition services;  placement in a community college program with classroom access to disabled and nondisabled peers; one-on-one tutoring, including vocational training; and mobility training.  In the administrative proceedings in this case, A.D.U. strongly objected to the FCC-ATP program, which would generally have provided these services, and insisted that but for her need for accompaniment (based on her severe seizures), K.U. was already able to navigate school campuses and did not require mobility training.

judge does not abuse his or her discretion when he or she bases a determination of bad faith on the movant's history of dilatory tactics in the course of the litigation and the dubious value of the proposed amendment.  *Thornton v. McClatchy Newspapers, Inc.*, 261 F.3d 789, 799 (9th Cir. 2001).

Courts have been particularly critical of proposed amendments that appear to "game" the system.  For example, in *Johnson*, the Court described as unduly prejudicial "late-inning knuckleball" a party's motion to amend its claims to greatly broaden their scope when its original theory appeared weak on the "eve of summary judgment."  809 F.Supp.2d at 1121-22.

Only briefly restating her original counterclaim addressing the ALJ's order for educational assessment and substituting three new claims (*see* Doc. 85-1 at 8, ¶ 19), A.D.U. both adds new claims that could have been advanced in the original counterclaim and fundamentally alters the nature of the case, which previously focused on a single issue that was factually well-defined.  An untimely motion to amend may either (1) present alternative theories of recovery under existing facts or (2) fundamentally alter the nature of the case.  *Mayreaux*, 376 F.3d at 427.  When an amendment merely incorporates alternative theories using existing facts, it falls safely within Rule 15(a)'s policy of promoting litigation on the merits over procedural technicalities.  *Id.*  But when, after a period of extensive discovery, a party proposes a late-tendered amendment that would fundamentally change the case to incorporate new causes of action and that would require discovery in addition to the administrative record, the amendment may be appropriately denied as prejudicial to the opposing party.  *Id.  See also Solomon v. North American Life and Cas. Ins. Co.*, 151 F.3d 1132, 1139 (9th Cir. 1998) (finding that the district court did not abuse its discretion in denying leave to amend based on undue delay and prejudice since the motion would have required additional discovery and delayed the proceedings); *Morongo Band*, 893 F.2d at 1079 (holding that the district court did not abuse its discretion in denying leave to amend when the new claims would have greatly altered the nature of the litigation and required the opposing party to prepare "an

entirely new course of defense"); *Singh v. City of Oakland, Cal.*, 295 Fed.Appx. 118, 122 (9th Cir. 2008) (holding that the district court did not abuse its discretion in denying the plaintiff leave to amend his complaint when the plaintiff had long known the facts alleged in the proposed amendment, and the new claims would have required additional discovery and trial preparation, prejudicing the opposing parties and delaying the proceedings).

A.D.U.'s motion to amend and supplement is untimely and prejudicial.

**B.     Bad Faith or Dilatory Motive**

Bad faith exists when the moving party seeks to amend merely to prolong the litigation by adding "new but baseless legal theories." *Griggs v. Pace American Group, Inc.*, 170 F.3d 877, 881 (9th Cir. 1999).  It includes amendments filed frivolously or for an improper purpose.  *Westlake North Prop. Owners Ass'n v. City of Thousand Oaks*, 915 F.2d 1301, 1305 (9th Cir. 1990).  Frivolity is determined under the objective standard set forth in F.R.Civ.P. 11: whether "to the best of the signer's knowledge, information, and belief formed after reasonable inquiry [the pleading] is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law." *Id.*  Bad faith includes claims brought to harass the opposing party, *Juras v. Aman Collection Service, Inc.*, 829 F.2d 739, 740 (9th Cir. 1987), *cert. denied*, 488 U.S. (1988), and those in which the allegations are false, constituting a fraud and willful imposition on the dignity of the Court.  *Chew Wing Luk v. Dulles*, 268 F.2d 824, 827 (9th Cir. 1959).  "Examples of bad faith have include—but are not limited to—instances in which a party makes a claim without alleging any newly discovered facts, makes a tactical decision to omit a claim to avoid summary judgment, or includes a claim to harass or burden the other party." *Stearns*, 763 F.Supp.2d at 1159 (*citations omitted*).

Having already concluded that the proposed amended and supplemental counter claim is untimely, this Court will not make an additional, independent finding of bad faith or dilatory

motive.  When a court has already determined to deny a motion to amend based on the movant's

undue delay, the court need not resolve whether the movant independently acted in bad faith.  *See*

*Johnson*, 809 F.Supp.2d at 1122.  *See also Alzheimer's Institute of Amer. v. Elan Corp. PLC*, 274

F.R.D. 272, 278 (N.D.Cal. 2011) ("[T]he Court need not find bad faith, because denial of leave to

amend is proper based on other factors").

### C.    Futility

Futility is a recognized basis for denying a proposed amendment.  *Kiser v. General Elec.*

*Corp.,* 831 F.2d 423, 428 (3d Cir. 1987), *cert. denied*, 485 U.S. 906 (1988).  The test for futility "is

identical to the one used when considering the sufficiency of a pleading challenged under Rule

12(b)(6)."  *Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988).  "[T]o survive a motion

to dismiss, a complaint must contain sufficient factual matter to state a facially plausible claim to

relief."  *Shroyer v. New Cingular Wireless Serv., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010), *citing*

*Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009).  "[D]ismissal for failure to state a claim is 'proper only

where there is no cognizable legal theory or an absence of sufficient facts alleged to support a

cognizable legal theory.'" *Shroyer*, 622 F.3d at 1041, *quoting Navarro v. Block*, 250 F.3d 729, 732

(9th Cir. 2001).  *See also Zucco Partners, LLC v. Digimarc Corp*., 552 F.3d 981, 1007 (9th Cir.

2009); *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008); *Polich v.*

*Burlington Northern, Inc.*, 942 F.2d 1467, 1472 (9th Cir. 1991).

The Federal Rules of Civil Procedure and applicable case law demand a more detailed

allegation of facts than that set forth in the proposed counter claim.  Rule 8 provides:

> **Claim for Relief.**  A pleading that states a claim for relief must
> contain:
>
> 1.    a short and plain statement of the grounds for the court's
>       jurisdiction, unless the court already has jurisdiction and the
>       claim needs no new jurisdictional support;
>
> 2.    a short and plain statement of the claim showing the pleader is
>       entitled to relied; and

3.      a demand for the relief sought, which may include relief in the alternative or different types of relief.

F.R.Civ.P. 8(a).

Rule 8 is intended "to protect defendants from undefined charges, and to keep the federal courts free of frivolous suits." *Howard v. Koch*, 575 F.Supp. 1299, 1304 (E.D. N.Y. 1982). Put another way, "[t]he purpose of Rule 8(a)(2) is to avoid verbose allegations; to notify the defendants of the claim upon which plaintiff seeks recovery; to assist and not deter the disposition of the litigation on its merits; to achieve brevity and clarity in pleading and to shape the issues for trial." *Levine v. McDonald's Corp.*, 1979 WL 1648 at *1 (D. Ariz. June 12, 1979) (No. Civ. 77-601 Phx. WPC). "It is the duty and responsibility, especially of experienced counsel, to state those essentials in short, plain, and non-redundant allegations." *Id.* at *2, *quoting Silver v. Queen's Hospital*, 53 F.R.D. 223, 226 (D. Hawaii 1971).

"Rule 8(a)'s simplified pleading standard applies to all civil actions, with limited exceptions." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002). Pursuant to Rule 8(a), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a). "Such a statement must simply give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz*, 534 U.S. at 512. Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of the cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 677, *citing Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Plaintiff must set forth sufficient factual matter accepted as true, to 'state a claim that is plausible on its face.'" *Iqbal*, 556 U.S. at 677, *quoting Twombly*, 550 U.S. at 555. While factual allegations are accepted as true, legal conclusions are not. *Iqbal*, 556 U.S. at 677**.**

*///*

24

Although accepted as true, "[f]actual allegations must be [sufficient] to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (*citations omitted*).  A plaintiff must set forth "the grounds of his entitlement to relief," which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Id.* at 555-56 (*internal quotation marks and citations omitted*).  Simply put, to adequately state a claim against a defendant, a claimant must set forth the legal and factual basis for his or her claim.

### D.   Amended and Supplemental Factual Allegations

A.D.U. seeks to expand the "basis" and factual allegations sections from four pages in the original counterclaim to ten pages in the proposed amended counterclaim.  A careful comparison of the allegations of facts in the amendment to those in the original reveals numerous changes of four identifiable types.  None justify amendment or supplementation of the counter claim.

#### 1.   Stylistic Changes

The proposed amended and supplemental complaint includes numerous stylistic changes that are not substantive but are apparently intended to place upon the amendment the stamp of A.D.U.'s new counsel: for example, "3.  All of the events that are at issue in this dispute took place within the Eastern District of California" is modified to read, "3.  All of the events that are at issue in this dispute took place within the *geographical area within the purview of the United States District Court for* the Eastern District of California."  Doc. 9 at 6; Doc. 85-1 at 3.  These modifications unnecessarily require the District and the Court to re-analyze the amended allegations in lieu of the original, adequate allegations.

#### 2.   Amplification of OAH Decision

The proposed amended and supplemental complaint includes extensive recitation of facts set forth in the OAH decision.  New paragraph 15, for example, encompasses approximately two single-spaced pages restating the ALJ's factual findings and legal conclusions in a manner designed

to shed favorable light of A.D.U. and unfavorable light in the District.  Doc. 85-1 at 5-7.  Since the OAH decision is a necessary part of the administrative record that has been filed for this Court's complete review, amending the counterclaim to recite the facts set forth in it is unnecessary and wastes the time and money of both the District and the Court.  In addition, such amendment is untimely since the contents of the OAH decision were available and known to A.D.U. when she prepared her original counterclaim.  *See Campbell v. Emory Clinic*, 166 F.3d 1157, 1162 (11th Cir. 1999) (holding that the district court did not abuse its discretion in denying a plaintiff's motion to amend which, late in the process of litigation, sought to incorporate facts that were available to the plaintiff when he filed his complaint).

### 3.   Legal Conclusions

The proposed amended and supplemental complaint incorporates numerous legal conclusions such as "18.  The ALJ erroneously omitted to set forth a reasoned explanation for its failure to include a compensatory education services award proportionate to the damage to and deprivation of K.U.'s education rights, for which District was responsible, in the grant of equitable relief."  Doc. 85-1 at 7-8.  Legal conclusions are not facts.  *Iqbal*, 556 U.S. at 677**.**  They are appropriately employed in the course of argument, whether in writing (briefs) or argument, but are not appropriate matters justifying amendment or supplementation of a counterclaim.

### 4.   Allegations Regarding A.D.U.'s Request to Amend Records

The final factual category includes the amended and supplemental factual allegations regarding A.D.U.'s efforts to amend certain unspecified errors and misrepresentations in K.U.'s educational records.  The first alleged instance occurred before A.D.U. filed her original counterclaim; the second, thereafter.  Although the allegations concerning A.D.U.'s 2012 demand for amendment are untimely, their timeliness is not the matter that requires this Court to deny

amendment and supplementation of the counter claim to include them.  These claims simply are not part of the administrative decision that is before the Court.

A.D.U. argues that since the District's refusal to incorporate her desired corrections relates to the broader topic of K.U.'s education, they are proper matter for inclusion in her counterclaim. A.D.U. draws her category too broadly.  Were the Court to accept her argument, this case could balloon nearly infinitely, to encompass her every complaint against the District as well as every issue the District might wish to advance against A.D.U..  Such a case would be both unmanageable and endless.

In addition, Section 1415(l) of "[t]he IDEA requires that administrative appeals procedures be exhausted before seeking judicial review under it or other 'Federal laws protecting the rights of children with disabilities . . . . seeking relief that is also available under this subchapter.'" *Child v. San Bernardino Unified Sch. Dist.*, 35 Fed.Appx. 521, 523 (9th Cir. 2002).  Despite her contention that she has exhausted these claims, A.D.U. neither pursued a statutorily authorized complaint to the District Board nor included a claim for amendment of K.U.'s educational records in any administrative proceeding disclosed to this Court.

### E.    FERPA Does Not Include a Private Right of Action

The second claim of the amended and supplemental complaint alleges that, by refusing to follow regulatory provisions when A.D.U. asserted errors in K.U.'s educational records, the District violated the Family Education Rights and Privacy Act ("FERPA"). See 20 U.S.C. §1232g.  The claim's basis having first arisen before the filing of this suit, it is properly addressed as an amendment to the complaint.

The proposed amended and supplemental complaint is silent regarding the specific changes that A.D.U. sought.  Accordingly, the Court concludes that claim two does not address A.D.U.'s requested changes *per se*, but only seeks to enforce FERPA's procedural provisions.  Because

FERPA does not provide a private right of enforcement, claim two is not cognizable and is thereby futile.

"'[T]he fact that a federal statute has been violated and some person has been harmed does not automatically give rise to a private cause of action in favor of that person.'" *Opera Plaza Residential Parcel Homeowners Ass'n v. Hoang*, 376 F.3d 831, 834 (9th Cir. 2004), *quoting Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979). Whether directly or as part of an action under 42 U.S.C. § 1983, an individual may not bring suit to enforce the provisions of FERPA. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 287 (2002). *See also Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 67 (1st Cir. 2002) ("FERPA does not confer a private right of action"); *Klein Indep. Sch. Dist. v. Mattox*, 820 F.2d 576, 579 (5th Cir. 1987), *cert. denied*, 485 U.S. 1008 (1988) ("[C]ourts which have considered the question have determined that no private cause of action, either explicitly or implicitly, was created or intended"); *Girardier v. Webster College*, 563 F.2d 1267, 1276-77 (8th Cir. 1977) (denying that a private right of action arises by inference when FERPA assigned enforcement to the Secretary of Education without specifying a private remedy); *Green v. Arpaio*, 2010 WL 5279911 at * 2 (D.Ariz. December 17, 2010) (No. CV-10-1481-PHX-GMS); *Smith v. Duquesne Univ.*, 612 F.Supp. 72, 79 (W.D.Pa. 1985), *aff'd*, 787 F.2d 583 (1986); *Price v. Young*, 580 F.Supp. 1, 2 (E.D.Ark. 1983).

Congress enacted FERPA under the spending power and conditioned the receipt of federal funds to restrictions on the access and disclosure of student records. *Gonzaga Univ.*, 536 U.S. at 278. If a public or private educational agency or institution fails to comply with the act and the regulations promulgated under it, the Secretary of Education is directed to withhold federal funds from the violator. *Id.* The Act grants the Secretary of Education the power to deal with violations of FERPA, directing the Secretary to "establish or designate [a] review board . . . . . for the purpose of investigating, processing, reviewing, and adjudicating violations." 20 U.S.C. §1232g (f and g).

A.D.U. may not bring an individual action to enforce the procedural requirements of FERPA.  The second claim is futile.

**F.**      **Claim Three is Futile**

In her third claim, A.D.U. seeks a writ of mandate, pursuant to California Code of Civil Procedure § 1085, ordering the District to comply with the provisions of California Education Code § 49070 regarding correction of a student's educational records.  For the first time in the amended and supplemental counter claim, A.D.U. alleges that when she requested certain unspecified corrections to K.U.'s school records, the District failed to comply with statutory procedures.  A.D.U. contends that the Court has supplemental jurisdiction over this state claim pursuant to 28 U.S.C. § 1367.

Under Cal.Educ.Code § 49069, parents of current or former students have an absolute right of access to any and all pupil records related to their children that are maintained by school districts or private schools.  A pupil record is "any item of information directly related to an identifiable pupil, other than directory information, that is maintained by a school district or required to be maintained by an employee in the performance of his or her duties whether recorded by handwriting, print, tapes, film, microfilm, or other means."  Cal.Educ.Code § 49061(b).  Directory information includes such items as the "pupil's name, address, telephone number, date of birth, email address, major field of study, participation in officially recognized activities and sports, weight and height of members of athletic teams, dates of attendance, degrees and awards received, and the most recent previous public or private school attended by the pupil."  Cal.Educ.Code § 49061(c).

A parent may file a written request with the district superintendent to correct or remove any written information in a pupil record which the parent alleges to be (1) inaccurate, (2) an unsubstantiated personal conclusion or inference, (3) a conclusion or inference outside the

observer's area of competence, (4) not based on the personal observation of a named person with the time and place of the observation noted, (5) misleading, or (6) in violation of the pupil's privacy or other rights.[9]  Cal.Educ.Code § 49070(a).  Within thirty days of a parent's filing a written request, the superintendent or his or her designee must meet with the parent and the certificated employee who recorded the information if that person is still a district employee.[10]  Cal.Educ.Code § 49070(b).  If the superintendent sustains the allegations, he or she shall or correction or removal and destruction of the information.  Cal.Educ.Code § 49070(b).  (A change in a pupil's grade is subject to additional provisions.[11]  *Id.*)

If the superintendent denies all or part of the allegations and refuses to correct or remove the disputed information, the parent may appeal within thirty days to the district's governing body, which must meet in closed session with the parent and employee, if available, within thirty days. Cal.Educ.Code § 49070(c).  If the governing board sustains any of the parent's allegations it shall order the superintendent to correct or remove and destroy the information at issue (except for grades, which are subject to additional procedural provisions).  *Id.*  The governing board's decision is final.  *Id.*  If the board's decision is unfavorable to the parent, the parent may submit a written statement of his or her objections that shall be made part of the student's record until the disputed information is corrected or removed.  Cal.Educ.Code § 49070(d).  In claim three, A.D.U. seeks a writ of mandate requiring the District to address her amendment requests in compliance with Cal. Ed. Code § 49070.

The District argues that claim three is futile because federal district courts lack jurisdiction over a claim for a writ of mandate under California Civil Procedure Code § 1085.  *See Hill v.*

---

[9] Section 49070 includes forms for parental requests (1) to correct or remove information from pupil records and (2) to appeal to the governing board a superintendent's decision denying the parental request.

[10] The superintendent or governing board may also convene a panel to assist in the determination.  Cal.Educ.Code § 49071.

[11] Because A.D.U. does not allege that she requested any change in K.U.'s grades, this decision will not address the specific provisions applicable to them.

1    *County of Sacramento*, 466 Fed.Appx. 577, 579 (9th Cir. 2012) ("Cal.Civ.Pro.Code § 1085

2    authorizes only state courts to issue writs of mandate.").  Arguing that the Court should exercise

3    supplemental jurisdiction under 28 U.S.C. § 1367, A.D.U. distinguishes her case from *Hill* based on

4    Ms. Hill's failure to satisfy certain predicate violations of substantive law for which she sought a

5    writ of mandate as relief.  By focusing solely on the decision in *Hill*, both parties fail to completely

6    analyze the question of whether this Court should exercise jurisdiction over a writ of mandate.

7          Federal district courts have original jurisdiction over "all civil actions arising under the

8    Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  In this case, the Court has

9    original jurisdiction because the District filed a complaint appealing administrative action under the

10   IDEA. If the Court has original jurisdiction over a case, it also has supplemental jurisdiction "over

11   all claims that are so related to claims in the action in the action within such original jurisdiction

12   that they form part of the same case or controversy."  28 U.S.C. § 1367(a).  A single case or

13   controversy exists for purposes of Section 1367 if the state and federal claims "derive from a

14   common nucleus of operative fact" such that the plaintiff "would ordinarily be expected to try them

15   all in one judicial proceeding."  *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966).  Because

16   A.D.U.'s request for amendments to K.U.'s educational records occurred independently of the IEP

17   proceedings that are the subject of the OAH order before this Court, her claim for a writ of mandate

18   falls outside the scope of supplemental jurisdiction.

19         In addition, even if the claims arise from a common case or controversy, a federal court may

20   decline to exercise supplemental jurisdiction over a state claim if (1) "the claim raises a novel or

21   complex issue of state law," (2) "the claim substantially predominates over the claim or claims over

22   which the district court has jurisdiction," (3)  "the district court has dismissed all claims over which

23   it has original jurisdiction," or (4) in exceptional circumstances, there are other compelling reasons

24   for declining jurisdiction."  28 U.S.C. § 1367 (c)(1)-(4).  "Supplemental jurisdiction "is a doctrine

of discretion, not of plaintiff's right."  *Tomlinson v. County of Monterey*, 2007 WL 2298038 at *2

(N.D.Cal. Aug. 8, 2007) (No. C-07-00990 RMW), *quoting City of Chicago v. International College

of Surgeons*, 522 U.S. 156, 172 (1997).  As a result, federal courts have generally been reluctant to

exercise supplemental jurisdiction over claims for writs of mandate under California law.  Some, as

in *Hill*, simply deny that federal courts have any jurisdiction over claims for California writs of

mandate.  *See also Layton v. Knipp*, 2013 WL 5348153 at * 2 (E.D.Cal. Sept. 23, 2013) (No. 2:13-

cv-1618-AC P) ("Federal district courts are without power to issue mandamus to direct state courts,

state judicial officers, or other state officials in the performance of their duties.").

        A grant of supplemental jurisdiction of a California mandamus action is not prohibited.  *See

Manufactured Home Communities, Inc. v. City of San* Jose, 420 F.3d 1022, 1027 n. 6 (9th Cir.

2005).  But mandamus proceedings "are uniquely in the interest and domain of the state courts."

*Clemes v. Del Norte County Unified School District*, 843 F.Supp. 583, 596 (N.D.Cal. 1994),

*overruled on other grounds*, *Maynard v. City of San Jose*, 37 F.3d 1396, 1403 (9th Cir. 1994).  A

federal court's exercise of jurisdiction over a state mandamus issue raises serious considerations

regarding comity and federalism.  *Id.*  As a result, federal district courts routinely decline to

exercise supplemental jurisdiction over California writ of mandate claims.  *Mory v. City of Chula

Vista*, 2011 WL 777914 at * 2 (S.D.Cal. March 1, 2011) (No. 10-cv-252 JLS (WVG)).  Where a

state law claim is inextricably tied to a request for a writ of mandamus, a federal district court

appropriately declines supplemental jurisdiction.  *Tomlinson*, 2007 WL 2298038 at *2.  *See also

Pacific Bell Telephone Co. v. City of Walnut Creek*, 428 F.Supp.2d 1037, 1055 (N.D.Cal. 2006);

*Moua v. City of Chico*, 324 F.Supp.2d 1132, 1143 (E.D.Cal. 2004); *Inman v. Superior Court of

California County of Stanislaus*, 2012 WL 3068790 at *7 (E.D. Cal. July 26, 2012) (No. 1:12-cv-

01049-AWI-BAM); *Sanchez v. City of Los Angeles*, 2010 WL 2569049 at *18 (C.D. Cal. May 26,

2010), *report and recommendations adopted,* 2010 WL 2572615 (C.D.Cal. June 18, 2010) (No. CV

09-8920-SJO (RNB)); *City Limits of Northern Nevada, Inc. v. County of Sacramento*, 2006 WL 2868950 at *3 (E.D. Cal. Oct. 6, 2006) (No. 2:06-cv-1244-GEB-GGH); *Spielbauer v. County of Santa Clara*, 2004 WL 2663545 at * 3 (N.D. Cal. Nov. 17, 2004) (No. C04-02265 JW).

Even if this Court were to evaluate whether the allegations in claim three were sufficient to constitute a cognizable claim, a number of elements would require its close scrutiny and raise complex issues of state law.  First, A.D.U. alleges that in both 2012 and 2013, she provided an unidentified designee of the superintendent with a written request to correct attendance history, enrollment history, and teacher identification set forth in K.U.'s educational records.  The vague nature of the factual allegations are insufficient to indicate that A.D.U. sought correction or removal of information that was part of K.U.'s "pupil record" rather than her "directory information," placing her request within the statutory scope.  For example, K.U.'s attendance history and enrollment history arguably fall within the statutory category of "dates of attendance."

In addition, although Section 49070(a) specifies that the parent serve the written request on the superintendent, A.D.U. alleges only that she served it on an unidentified designee of the superintendent.  Section 49070(b) recognizes the participation of a designee of the superintendent only after the superintendent has been notified in accordance Section 49070(a).  Thus, on its face, the amended and supplemental counter claim does not allege compliance with the statutory requirements.

A.D.U. attempts to circumvent her failure to appeal the decision to the governing board by alleging that the District failed to advise her of her right to appeal.  Having failed to appeal the denial of her request to the District's governing board, A.D.U. has not exhausted her administrative remedies.  A.D.U. does not provide any authority requiring the District to provide such notice, and the Court has been unable to identify any.  Considered on an equitable basis, A.D.U. been represented by counsel at nearly every stage of the proceedings, and the record demonstrates that

she has extensive experience litigating on behalf of K.U.  A.D.U. alleges familiarity with state and federal statutes applicable to the education of disabled students and can hardly claim to have been naïve or mislead because the District did not provide directions for appeal.  Resolution of an issue such as this is best reserved for a California state court.

Finally, even if A.D.U. could allege law and facts to support a conclusion that she exhausted her administrative remedy by appealing to the District's governing board, her argument that this claim arises from the same case or controversy as Case No. 2012010705 casts too large a net.  As previously discussed, extending the scope of this appeal to all aspects of K.U.'s education would exceed the reasonable limits of "the same case or controversy."  The scope of this Court's review is circumscribed to the OAH's decision in Case No. 2012010705, of which A.D.U. requests to amend K.U.'s records were not a part.

As a result of the vague allegations and the multiple and complex state-law issues that require resolution, this Court declines to exercise supplemental jurisdiction over A.D.U.'s claim for enforcement through a writ of mandate.  The absence of federal jurisdiction renders proposed claim three futile.

**V.    <u>Conclusion and Order</u>**

For the reasons set forth above, A.D.U.'s motion to amend and supplement the counter-claim is hereby DENIED.

IT IS SO ORDERED.

Dated:   <u>October 28, 2013</u>          <u>/s/ *Michael J. Seng*</u>
                                                                    UNITED STATES MAGISTRATE JUDGE